THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DALE HINE, Defendant-Appellant.

First District (2nd Division)    No. 79-134

Opinion filed September 16, 1980.

Allan J. Marco, of Marco & Mannina, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Michael Demetrio, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Defendant, Dale Hine, was charged by information with one count of deviate sexual assault in violation of section 11—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 11—3) and two counts of indecent liberties with a child in violation of sections 11—4(a)(2) and 11—4(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, pars. 11—4(a)(2) and 11—4(a)(3)). Defendant's pretrial motion to suppress identification evidence was denied. Following a trial by jury defendant was found

guilty as charged. The trial court entered judgment only upon the verdict finding defendant guilty of deviate sexual assault and sentenced defendant to a term of five to 10 years. Defendant appeals presenting the following issues for review: (1) whether defendant was proved guilty of deviate sexual assault beyond a reasonable doubt; (2) whether defendant was denied a fair trial by allegedly improper comments made by the prosecutor during closing arguments; and (3) whether the trial court erred in limiting the area of inquiry during defendant's motion to suppress identification testimony.

For reasons hereinafter set forth, we affirm.

On September 15, 1977, at approximately 7:45 a.m., a 15-year-old girl, the victim herein, was walking to her girl friend's house on her way to school. It was raining heavily, and as the victim reached a street corner a light blue automobile with a dark top approached the corner. The driver leaned over, opened the passenger door and offered the victim a ride which she accepted. As she entered the automobile she observed a tear in the upholstery of the black bench seat, a gray sweater lying on the seat, and a pair of "teardrop style" glasses lying on the dashboard in front of the driver.[1] She further observed that the driver appeared to be about 18 or 19 years of age, approximately six feet tall, of heavy build and wore a blue checked flannel shirt, jeans, black cowboy boots with pointed toes, and a silver watch. The driver had brown, wavy hair which he wore approximately two to three inches below his ears and sideburns which he wore approximately one inch below his ears.

A conversation ensued during which the driver asked the victim where she was going, and she responded. During the conversation she and the driver were directly facing each other. Thereafter approximately one to two minutes transpired as the driver operated the automobile during which time the victim observed the driver's face five times. The driver then grabbed the victim's hair thereby attempting to pull her head down toward his lap. After struggling for approximately three minutes, during which time the victim had a further opportunity to view the driver's face, the driver overcame the victim, placed the gray sweater over her head and continued to "hold [her head] down."

The driver ordered the victim to partially disrobe, and when she refused he warned her that he had a knife and two friends waiting for her if she failed to comply. After the victim disrobed, the driver forced her to perform an act of oral copulation upon him. The driver then lifted the victim's head by pulling her hair and ordered her to dress. He inquired

---

[1] The victim noted in her testimony that defendant was wearing the same style glasses at trial.

whether she would report the incident to the police, and she responded in the negative. During this conversation which lasted approximately one minute, the victim and the driver were once again directly facing each other. As the victim exited the automobile, she again observed the driver's face. She then ran home.

The victim's foster mother observed the victim arrive home at approximately 8:15 a.m. The victim, crying, choking and very upset, went into the bathroom and began retching. The victim later noticed a scratch on her face which she attributed to the struggle with the driver. Pursuant to the foster mother's telephone call, a police officer arrived at the victim's home. The victim gave the officer a detailed description of the driver.

At approximately 9 a.m. the victim, accompanied by her foster mother, went to the police station. She gave a description of the driver to Officer Tesmond and was requested by Officer Tesmond to view photographs. At that time Tesmond observed a scratch on the victim's face. Both the victim and her foster mother testified that the victim had viewed one or two "trays" of photographs and several high school year books. Officer Tesmond testified that he had shown her at least 10 "trays" of photographs and one school yearbook. The victim did not, at that time, make any identification. The victim, her foster mother and a police officer toured the area in which the victim was attacked in an attempt to locate the automobile driven by her attacker. Although the victim stopped and looked inside several blue cars with dark tops, none of them had a tear in the upholstery nor were any of them identified by the victim. The victim's foster mother drove her to the hospital where she was examined by Dr. Charles Rimpila who observed a "fresh linear abrasion on the right side of her face."

On January 12, 1978 the victim went to the police station, at their request, to view more photographs. Officer Tesmond showed the victim one "tray" of photographs which contained defendant's picture.[2] The victim "picked out" defendant's photograph and said, "That's him." Officer Tesmond inquired whether she was certain, and she repeated, "That's him."

Pursuant to the victim's identification, Officer Tesmond arrested defendant. At the time of his arrest defendant had in his possession a watch and a knife. In response to Officer Tesmond's inquiry as to defendant's whereabouts on September 15, 1977, defendant replied that he was working at Colonial Auto Supply, Inc.

Later that day the victim, in the company of her foster mother,

---

[2] Officer Tesmond testified that he had placed defendant's picture in the "tray" immediately prior to the victim's viewing of the "tray" on January 12, 1978. Although the victim had viewed the same tray on September 15, 1977, the defendant's photograph had not been included in the tray at that time.

returned to the police station to view a lineup. The police showed her a photograph of a prior lineup in which defendant participated, and she promptly identified defendant. Upon viewing the lineup, she immediately identified defendant and informed the police officer that defendant was wearing the glasses which she had observed on the dashboard of the automobile on the day of the incident.

The employment records of Colonial Auto Supply, Inc., reveal that defendant began employment on September 19, 1977. Mr. Wherity, Colonial's president, testified that defendant at first did not wear glasses while driving the company truck but began wearing glasses when Wherity discovered that defendant's license required him to wear corrective lens. The glasses worn by defendant at that time were the same as those worn by defendant in court. Mr. Wherity further testified that defendant had collar length hair, wore cowboy boots and drove a 1964 Pontiac which was either metallic blue or gray.

Defendant testified that he had never seen the victim prior to trial. He described himself as being six feet two inches tall, of husky build and as having "pretty long hair." He was 20 years of age in September 1977. He had never driven a car which was silver or metallic blue, nor did any of his friends own a blue car with a black top. In September 1977 he owned a pair of orange-colored cowboy boots which he occasionally wore to work. He purchased a pair of black dress boots one week after he had begun working at Colonial Supply, Inc.

Approximately two or three weeks prior to September 3, 1977, defendant had lost his glasses. He had in his possession no glasses between that time and September 24, 1977, when he picked up his new glasses. Defendant further testified that on September 15, 1977, he was awakened by a telephone call from a Bruce Boynton who informed him of a position available at Colonial Auto Supply, Inc.

Defendant's optometrist testified on defendant's behalf that on September 3, 1977, defendant was examined and ordered a pair of aviator type glasses which he picked up on September 24, 1977.

Officer Kuzara testified on behalf of defendant that on September 24, 1977, defendant was driving a beige automobile. Linda Novotny, Bruce Boynton and James Rick, identified as friends of defendant, all testified that they had never known defendant to own a blue car with a black roof, nor did they recall ever seeing such a car at defendant's home. Mr. Boynton further testified that he had had a telephone conversation with defendant at approximately 10 a.m. on September 15, 1977.

Mr. Wheeler, a co-worker of defendant, testified that when he met defendant on September 26, 1977, defendant was driving a white automobile. Mr. Wheeler also recalled that he had overheard defendant mention a purchase of cowboy boots.

## I.

Defendant contends that he was not proved guilty of deviate sexual assault beyond a reasonable doubt.

## A.

In support of this contention defendant argues that the evidence which he adduced at trial demonstrates: (1) that he has never owned a blue car with a dark top; (2) that he did not have glasses at the time of the incident; (3) that he did not own cowboy boots which match the description given by the victim; (4) that he had received a telephone call at his home shortly after the alleged incident; (5) that he owned a gold watch, not a silver one; and (6) that the victim did not mention defendant's facial twitch which is quite evident.

Because the trier of fact is peculiarly suited to determine questions of truthfulness, a reviewing court will not readily substitute its own conclusion unless the proof is so unsatisfactory as to justify a reasonable doubt of guilt. (*People v. Boney* (1963), 28 Ill. 2d 505, 192 N.E.2d 920.) To the extent that testimony is conflicting, it is the province of the trier of fact to resolve the conflict and decide which witness or witnesses will be believed. (*People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644.) Conflict in testimony does not in itself establish a reasonable doubt of defendant's guilt. (*People v. Bowen* (1975), 26 Ill. App. 3d 182, 324 N.E.2d 652.) Discrepancies in testimony, such as those argued by defendant, do not destroy the credibility of the witnesses but go only to the weight to be afforded to their testimony. (*People v. Montgomery* (1977), 51 Ill. App. 3d 324, 366 N.E.2d 623.) When the trier of fact renders a decision based upon credible and substantial evidence which is sufficient to convict, the verdict may not be set aside merely because of minor inconsistencies, such as those in the case at bar, which the trier of fact properly chose to resolve in favor of the State. (*People v. Pelegri* (1968), 39 Ill. 2d 568, 237 N.E.2d 453.) It is sufficient if all the evidence, taken together, satisfies the trier of fact beyond a reasonable doubt of the accused's guilt. Proof of guilt beyond a reasonable doubt does not require proof beyond *any possibility of a doubt. People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801. (Emphasis added.)

In the case at bar, we cannot logically conclude that the jury's determination as to the weight and credibility to be given the victim's testimony over the evidence adduced by defendant was manifestly erroneous. The evidence presented by the State is not improbable, unconvincing or contrary to human experience. The State's case, in view of all the evidence, has few inconsistencies and none sufficient to raise a reasonable doubt as to defendant's guilt.

■■ The testimony of a complaining witness, although uncorroborated, is sufficient to justify a conviction if that testimony is clear and convincing. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.) In the case at bar the identification testimony of the victim is clear and convincing. The evidence adduced at trial discloses that the victim had an excellent opportunity to observe her attacker in the daylight and for an extended period of time. As a result she was able to provide the police with a detailed description of defendant and was able to identify him in both a photographic array and lineup. In our opinion the evidence adduced at trial was sufficient to support the jury's verdict.

### B.

In support of his contention that he was not proved guilty beyond a reasonable doubt, defendant also argues that it was error to permit Officer Tesmond to testify as follows to statements made by the complainant:

"Q. [Assistant State's Attorney] * * * Did you observe [the victim] as she went through People's Exhibit 2, for identification?
A. Yes, sir.
Q. What did you observe?
A. She proceeded through the photos. When she reached the one photo she stopped and made a statement, 'That is him.'
Q. What happened then?
A. I asked her, 'Are you sure?' And she repeated, 'That is him.' "

Defendant relies upon *People v. Lukoszus* (1909), 242 Ill. 101, 89 N.E. 749, and *People v. Wright* (1965), 65 Ill. App. 2d 23, 212 N.E.2d 126, wherein it was held to be reversible error to permit a police officer to repeat the victims' statements. In both of these cases the sole evidence involving defendant in the crime was the testimony of the victim, and the testimony of the police officers was offered to bolster otherwise uncorroborated testimony.

■■ As noted above, the victim not only positively identified defendant from his photograph on January 12, 1978, and in a subsequent lineup, but the victim's identification was corroborated by the detailed description she gave the police immediately following the attack on September 15, 1977.[3] Officer Tesmond's testimony was merely cumulative and not prejudicial. *People v. Olmos* (1978), 67 Ill. App. 3d 281, 296, 384 N.E.2d 853.

---

[3] In *Wright*, there was no evidence that the victim gave a description of defendant to the police. Moreover, in *Wright* the trial court permitted the victim and two different police officers to testify extensively concerning previous identifications made by the victim and the details of the crime.

## C.

In support of his contention that he was not proved guilty beyond a reasonable doubt, defendant further argues that he was improperly prevented from using a police composite sketch to impeach the victim's identification of defendant. The State maintains that the trial court properly prohibited defendant from using the composite sketch on the basis that the sketch constituted inadmissible hearsay evidence which in no way could serve to impeach the complainant's testimony.

The courts in Illinois have consistently held that it is error to admit a police artist's sketch into evidence because the sketch constitutes impermissible written hearsay evidence. (*E.g., People v. Rogers* (1979), 75 Ill. App. 3d 866, 394 N.E.2d 813; *People v. Fair* (1977), 45 Ill. App. 3d 301, 359 N.E.2d 848.)[4] An artist's sketch frequently reflects the artist's interpretive impressions based upon the personal observations of another and is therefore inadmissible. (*People v. Turner* (1968), 91 Ill. App. 2d 436, 235 N.E.2d 317.) There may be situations, however, where a witness can adopt the artist's sketch by reviewing the various features portrayed on the sketch and accepting the final product as substantially accurate. (See *People v. Tedder* (1980), 83 Ill. App. 3d 874, 404 N.E.2d 437;*People v. Burgin* (1979), 74 Ill. App. 3d 58, 392 N.E.2d 251.) When this occurs, the sketch is no longer the statement of the artist, but becomes, by adoption, that of the witness. In this situation, the witness may be subject to cross-examination by use of the sketch for any material discrepancies between the sketch and subsequent identifications.

■■ The record in the case at bar demonstrates that the victim never affirmatively adopted the composite sketch as her own. At no time did the victim express satisfaction with the police artist's effort to match the descriptions she gave him with the finished composite sketch. Because the victim never made a clear and definite adoption of the sketch, we conclude that the trial court did not err in ruling the sketch inadmissible for impeachment purposes.

## II.

Defendant contends that he was denied a fair trial because of allegedly prejudicial comments made by the prosecutor during closing arguments. In support of this contention defendant argues that the prosecutor tendered statements of facts not in evidence, expressed his personal opinion as to the guilt of defendant, employed arguments calculated to inflame the passions or prejudices of the jury, and diverted

---

[4] "The reasons such drawings and sketches are considered to be hearsay is because part of their value rests upon the credibility and competency of some person other than their creator and because the creator's beliefs and interpretations are inevitably woven into the final product." *Rogers*, at 869.

the jury from its duty to decide the case on the evidence by making predictions concerning the consequences of the jury's verdict.

In considering defendant's arguments, we first note that a prosecutor is permitted great latitude in his closing argument (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847), and the trial court's determination of the propriety of the closing argument will generally be followed absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324; *Weatherspoon*, at 322.) It has been held to be impractical to lay specific guidelines for proper argument to the jury (*Weatherspoon*, at 322; *People v. Gilmore* (1969), 118 Ill. App. 2d 100, 254 N.E.2d 590, *cert. denied* (1970), 400 U.S. 845, 27 L. Ed. 2d 81, 91 S. Ct. 89), and thus each case must be decided upon its own facts. *People v. Bigsby* (1977), 52 Ill. App. 3d 277, 367 N.E.2d 358.

Defendant first asserts that the prosecutor argued facts not of record. Defendant in particular claims that he was prejudiced when the prosecutor argued:

> "* * * We have a lot of different cases, and the vast percentage of our cases are single identification cases.* * *"

This statement was in direct response to defense counsel's intimations that single identifications were insufficient to convict. Defendant also argues the impropriety of the prosecutor's suggestion that defendant did not pick up his new glasses because he could have found his old ones. This suggestion was in direct response to defense counsels' arguments that defendant did not pick up his glasses from the optician for three weeks because he did not have the money to pay for them. Where the argument of defense counsel invites or provokes a response, defendant cannot complain that he was prejudiced by the response. *People v. Trimble* (1975), 27 Ill. App. 3d 353, 361, 326 N.E.2d 437.

Defendant also claims he was prejudiced when the prosecutor argued:

> "* * * I hitchhiked, which wasn't something to do, it was foolish * * *."

Both parties have a right to comment on the evidence and to draw any legitimate inferences therefrom. (*People v. Fleming* (1975), 36 Ill. App. 3d 612, 621, 345 N.E.2d 10.) In the case at bar the victim testified that she had accepted a ride with defendant, a stranger. It can be inferred therefrom the victim's action was indeed foolish.

Defendant further argues the impropriety of the prosecutor's comments that defendant did not ask the victim "where she was going right away" and that the victim said that she would never forget defendant's face and that horrible incident. Although both of these statements appear to be misstatements of the fact, unintentional

misstatements of fact do not in themselves require reversal. (*Weatherspoon*, at 322; *People v. Kitchen* (1977), 53 Ill. App. 3d 521, 368 N.E.2d 528.) The trial court's admonition that closing arguments are not evidence and thus any statements made in argument and not based upon the evidence should be disregarded remedied any possible prejudice. *People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 121-22, 390 N.E.2d 1339.

Defendant also argues that the prosecutor improperly expressed his personal opinion of defendant's guilt and employed arguments calculated to prejudice the jury when he argued:

"* * * You let him lie. * * * They have had 12 months since the day of the arrest to make a story. * * * They aren't coincidences, they are the truth, he is the guy. * * *"

While a prosecutor may not offer a purely personal opinion of the guilt of the accused, it is proper for him to argue or express his opinion that the accused is guilty where that opinion is based solely on the evidence. (*People v. Prim* (1972), 53 Ill. 2d 62, 77, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2793; *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 448, 359 N.E.2d 871.) From our examination of the record, it is apparent that in each of the above instances the arguments made were founded on the evidence and were not expressions of purely personal opinions nor arguments employed to prejudice the jury. Moreover, it is not reversible error for a prosecutor to say that a witness lied if his statement is founded on the evidence. (*People v. Lewis* (1976), 38 Ill. App. 3d 995, 999, 349 N.E.2d 528.) The prosecutor's characterization, while harsh, was not without an evidentiary basis.

Defendant also argues that the prosecutor both inflamed the passions of the jury and diverted the jury from its duty to decide the case on the evidence by making predictions of the consequences of the jury's verdict when he argued:

"* * * You let him get back in that car, and you drive your kid to school. * * *"

While such comments are not to be condoned, this comment is not of such magnitude as to require reversal.

■■ We have examined in detail the final arguments by the prosecutors as well as by defense counsel. While many statements would have better been left unsaid, there has been no showing that any of the remarks questioned by defendant influenced the jury and resulted in substantial prejudice (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881); that the remarks were a material factor in defendant's conviction (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363); that they were so inflammatory as to deprive defendant of a fair trial (*People v. Murdock* (1977), 50 Ill. App. 3d 198, 365 N.E.2d 1301); or that the verdict would have been different

had the comments not been made. (*People v. Trice* (1970), 127 Ill. App. 2d 310, 262 N.E.2d 276.) We therefore conclude that no prejudicial error resulted from the prosecutor's argument.

### III.

Defendant made a pretrial motion to suppress the identification evidence on the grounds that the identification procedures employed by the police were suggestive. At the hearing on the motion defendant made several attempts to question the victim concerning her opportunities to observe him at the time of the incident. The rationale for this line of questioning apparently was that if the victim did not have an adequate opportunity to observe him at the time of the incident, the subsequent identification of defendant must have been or probably was improperly suggestive. The trial court sustained the objection to the questioning when the prosecutor argued that details of the incident were "without the scope of this motion." At the conclusion of the State's case-in-chief, defendant renewed his motion to suppress the victim's identification of him. The trial court, after hearing extensive argument by defense counsel based upon the victim's testimony at trial, denied the motion.

While an exhaustive catalogue of what may be relevant at a hearing on a motion to suppress identification evidence can hardly be announced, it may be said with definiteness that the opportunity to observe or the lack of an opportunity to observe is certainly relevant when determining whether an identification by a witness was independent and free from suggestive influence. (*People v. Williams* (1972), 52 Ill. 2d 455, 462, 288 N.E.2d 406.) However, as in *Williams*, we do not judge that the failure to allow questioning at the hearing on the motion to suppress was prejudicial. At trial the question of the victim's opportunity to observe defendant was fully covered and the record demonstrates that the victim had adequate opportunities to observe defendant. In addition defendant renewed his motion to suppress following the close of the State's case-in-chief and the trial court heard extensive argument thereupon.

Based upon the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS and HARTMAN, JJ., concur.